William A. REUBE et al.

v.

PHARMACODYNAMICS, INC., et al.

Civ. A. No. 71–118.

United States District Court,
E. D. Pennsylvania.

June 28, 1972.

Supplemental Memorandum and Order
Sept. 12, 1972.

Daniel E. Farmer, MacCoy, Evans & Lewis, Philadelphia, Pa., for plaintiffs.

William P. Thorn, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

HANNUM, District Judge.

On January 14, 1971, plaintiffs filed a Complaint charging various defendants, including Paul H. Rose, with violations of Section 17(a) of the Securities Act of 1933, as amended, 15 U.S.C. § 77q(a),[1] and Section 10(b) of the Se-

---

1. 15 U.S.C. § 77q(a) provides:

"Fraudulent interstate transactions.

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

curities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b),[2] and Rule X–10B–5 of the Rules and Regulations of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5.[3] District Court jurisdiction was asserted under Section 22 of the Securities Act of 1933, as amended, 15 U.S.C. § 77v,[4] and Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa.[5] Pendent jurisdiction was asserted over certain non-federal claims, however, for purposes of the motions presently before the Court we will only consider the claims raised under Section 10(b) of the Securities Exchange Act of 1934, and Rule X–10B–5.

Pursuant to Rule 64 of the Fed.R.Civ. P., 28 U.S.C., and the fraudulent debtors laws of Pennsylvania, writs were issued to attach the property of the defendant Paul H. Rose. These writs were served upon the Continental Bank and Trust Co., and attached two accounts of de-

> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

2. 15 U.S.C. § 78j(b) provides:
> "Manipulative and deceptive devices
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive devise or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

3. Rule X–10B–5 provides:
> "It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
> (1) to employ any device, scheme, or artifice to defraud,
> (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

4. 15 U.S.C. § 77v provides:
> "Jurisdiction of offenses and suits
> (a) The district courts of the United States, and the United States courts of any Territory, shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto, and, concurrent with State and Territorial courts, of all suits in equity and actions at law brought to enforce any liability or duty created by this sub-chapter. Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

5. 15 U.S.C. § 78aa provides:
> "The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

fendant Rose and his wife, Naomi Patricia Rose. Plaintiffs have posted bond with the Clerk in double the value of the property attached. The garnishee has filed its report.[6]

On February 16, 1971, defendant Paul H. Rose and Naomi Patricia Rose filed a motion to intervene and dissolve the attachment. They assert that the accounts attached are held by them as tenants by the entireties and therefore are not subject to attachment.

On March 27, 1972, the plaintiff filed a motion for summary judgment pursuant to Rule 56 of the Fed.R.Civ.P., 28 U.S.C.

The defendant, Paul H. Rose (Rose), is an osteopathic physician and surgeon. Rose claims to have invented a drug that is useful in the treatment of diseases that involve inflammation of tissue. The drug is the result of mixing together two readily available prescription drugs in definite proportions. Rose has applied for a patent on this combination which he calls "actasterin".[7] Rose, Joseph Funfer (Funfer), and Wayne S. Bitting (Bitting), formed Pharmacody-

---

6. The garnishee reports that they hold two deposit accounts in the name of Paul H. Rose which he holds jointly with his wife, Naomi Patricia Rose; that the above accounts are joint account of husband and wife as tenants by the entireties with either having the right to draw thereon.

7. Rose in his deposition describes the drug as follows:

"Q. Doctor, the patent application that's already been made an exhibit, as I understand what you have said, is really the sole asset of Pharmacodynamics; it makes it or breaks it on that?
A. That's right.
Q. Does the drug on which you submitted the patent application have a name?
A. Yes. It has a name I have given to it.
Q. What is that?
A. It is called Actasterin.
Q. Would you spell that, please?
A. A-c-t-a-s-t-e-r-i-n.
Q. One thing I am hazy on: Is the patent application for the process of making the drug, or is it the chemical structure of the drug itself?
A. No.
It is the chemical structure of the drug that counts.
Q. All right. Did you have counsel when you made that patent application?
A. Oh, yes.
It was Mr. Kurtz.
Q. I see. What are the components of Actasterin?
A. Triamcinolone—
Q. Please spell that.
A. T-r-i-a-m-c-i-n-o-l-o-n-e.
Q. All right.
A. —and ACTH.
Q. And in the process of making the drugs, the drug, are these two different chemicals which are combined?

A. Yes, in very definite proportions.
Q. I see. But what makes it unique is the proportion, not some process through which the two components are put in order to arrive at the drug. Is that right?
A. It is the proportion.
Q. So that if I knew the proportion, I could do it by measuring out the right triamcinolone and everything?
A. Yes, The proportions.
Q. Are those two components normal kinds of chemicals that are readily available?
A. Yes. They have been approved by F.D.A.
Q. But they are drugs on the market?
A. Yes.
Q. But they are prescription drugs?
A. Yes.

. . . . . .

Q. What is the purpose of the drug for which you have applied for a patent?
A. It is for the treatment of diseases that involve the process of inflammation, and those are many, notably arthritis, psoriasis, allergies, anything that involves the process of inflammation.
Q. What testing or experimentation led you to feel that this was a patentable drug?
A. Four and half to five years of hard work.
Q. Well, what precisely did you do?
A. Well, I tested it on people, with their permission.
Q. These people were patients of yours?
A. Yes.
Q. What did the testing consist of?
A. Actually giving them the preparation—
Q. All right. And—
A. —and seeing what benefits, if any, resulted.
Q. Did you also give other people one of the two components and see how they did?

namics, Inc., (Pharmaco) to exploit the drug. The dispute in this case arises from the sale of stock in Pharmaco to the plaintiffs.[8]

A. A blind study was done, yes. In fact, a double blind cross-over study was done.

Q. Do you have records of that?

A. Extensive records.

Q. Is any F. D. A. approval or anything required to carry out these kinds of tests?

A. No.

Q. To your knowledge, is there any Pennsylvania pharmocol law which says what you can and cannot do?

A. Well, I'm a physician. I'm allowed to give my patients what I feel is good for them. As long as I don't give them something that I know will harm them, I'm all right.

Q. What special training have you had in pharamacology or whatever area relates to this drug?

A. I have a master's degree in biochemistry.

Q. From what institution?

A. From West Illinois State University.

Q. What year did you receive that, Doctor?

A. 1958, I believe.

Q. What contacts have you had with other people regarding the marketability of this?

A. The marketability?

Q. What are your plans for the corporation's handling of this patent which is now the property of the corporation?

A. We haven't arrived at any plans, as yet.

Q. What are the possibilities that you think of?

A. The possibility is absolutely immense.

Q. But I mean, would it be a question of selling the patent rights, once it is demonstrated to be valuable, into production and marketing it?

A. This is what would have to be answered one way or the other, whether Pharmacodynamics would go for its own production and marketing or whether we would sell these rights to a different company, such as Lilly, and let them go forward on a royalty situation.

Q. Is testing required before this drug could be marketed?

A. Animal experimentation would probably have to be done.

Q. Is F. D. A. approval required before you can market the drug?

A. Very likely.

Q. And how long does that kind of experimentation generally take?

A. It could take up to three years.

Q. And how much more money would be involved in carrying it out?

A. Well, now, that's—that's questionable. I would hate to say how much more.

Q. Well, are we talking about a figure over or under $5,000.00

A. It would be considerably over $5,000.00 It might take another $100,000.00 to do the thing.

Q. All right. Have you had any discussions other than that letter which is an exhibit, from Eli Lilly, relative to marketing or developing it with outside people?

A. No.

Q. Have you approached anyone on the outside?

A. No. I have been frightened to approach anyone.

Q. Afraid it would be stolen?

A. Yes. I think I have got something that is really worth something.

Q. All right.

A. And I am afraid it would be taken away from me. It could be done so easily that—

Q. Do I take it that, at this point, you need some other source of funds before the thing can be made practical?

A. Yes. Some.

Q. So that, really, development is kind of stopped at this point?

A. At this point, yes.

How does the drug work on the inflamed tissues?

I am not sure I understand what makes the action different when the two drugs are put together as opposed to when they are apart.

A. That's the rub. That's where I think I have really got something. ACTH, you see, has one set of side effects—

Q. I see.

A. —that prohibits its use over a long period of time, and triamcinolone has another set of side effects which also prohibits its long-time-period use.

Combining the two seems to cancel out those side effects, and it can be used over considerably longer lengths of time.

The results of combining the two have been absolutely amazing, absolutely amazing. They are unbelievable.

See, deposition of Rose, pp. 61–63, 67–72. (hereinafter "Rose")

8. No shares were actually issued; however, each of the persons who paid any money

Rose and defendant Funfer prior to the formation of Pharmaco agreed that they would divide any financial remuneration resulting from the sale or licensing of the drug in the following manner: Rose 80%, and Funfer 20%.[9]

Rose and defendant Bitting entered into a pre-incorporation agreement in which it was agreed that they would retain complete control of the corporation and that the corporation would pay Bitting a salary of $75,000 a year and Rose a salary of $100,000 a year. In addition, the agreement provided that the corporation would "reimburse" Rose for research expenses of $100,000 plus pay him $100,000 and 10% of the royalties for assignment of the patent application. It was further agreed that Rose was to be paid for assignment of the patent application out of the proceeds from the sale of stock.[10]

to Rose did so with the understanding that it was for the purchase of stock. In this opinion we shall continue to call the ownership interest purchased by plaintiffs a "security" or "stock". Rose, pp. 31, 32.

9. The agreement between Rose and Funfer provides:
"This agreement executed this 16th day of April, 1970 between Dr. Paul H. Rose and Mr. Joseph Funfer.

WHEREAS Dr. Rose has invented certain new improvements in therapeutic compositions and has applied for a patent, (bearing the attorney's file No. M 298) and filed in the United States Patent Office on _____, Serial No. _____ and

WHEREAS Mr. Funfer has aided in the advancement of this invention including advancing certain sums of money toward the preparation of the patent application.

Now therefore, the parties agree that in consideration of their individual contributions they will divide any financial remuneration resulting from sale or licensing of this invention in the following manner: Dr. Paul H. Rose 80 percent, Mr. Funfer 20 per cent.

Recognition of the foregoing the parties set forth their signature below.
Dr. Paul H. Rose
Joseph W. Funfer."
The defendant Rose identified the above document in this deposition.
"Q. Dr. Rose, would you examine Plaintiffs' Exhibit No. 1 and identify it?
A. This is an agreement between Mr. Funfer and I.
Q. What is the date of its execution?
A. It says the 16th of April, 1970.
Q. Was anyone else present at the time that agreement was signed?
A. No.
This was just between Mr. Funfer and I.
Q. Is that your signature that appears on the bottom?
A. Yes. It is.

Q. Are you familiar with Mr. Funfer's signature?
A. Yes. I am.
Q. Is that Mr. Funfer's signature?
A. Well, I would rather he identify that. He is sitting right outside.
Q. Well, to the best of your knowledge, based upon your familiarity with his signature, does that look like his signature?
A. Yes.
Q. Has that been superseded or amended by any other agreement subsequent to this date?
A. This agreement is just between Mr. Funfer and I, and it still stands."
Rose, pp. 10, 11.

10. The agreement between Rose and Bitting provides:
"THIS AGREEMENT made this 26th day of June, 1970 between Paul H. Rose, D.O., (hereinafter called "Rose") and Wayne S. Bitting (hereinafter called "Bitting")
Witnesseth:
WHEREAS, Rose has developed a drug named actasterin for the treatment of Arthritis and other diseases for which a patent pending No. 35559 with the United States Patent Office; and
WHEREAS, the parties hereto have formed a corporation named Pharmacodynamics Inc., to research, produce, and distribute the aforesaid drug and others which Rose may develop;
NOW THEREFORE, the parties hereto, intending to · be legally bound hereby, agree as follows:
1. A corporation has been created in the State of Delaware, to be known as PHARMACODYNAMICS, INC., (hereinafter called the "Corporation").
2. The purpose of the corporation shall be to engage in pharmaceutical drug research and the production of drugs and medicines.
3. The corporation shall have an authorized capital in the amount, number, and classes of shares that the parties may agree upon; provided only that

Rose shall have the majority of the voting rights applicable to all issued shares. Shares shall be divided into three classes; 'Class A' common, having a par value of one cent (1¢) per share to be sold to the Executive Committee which shall consist of Rose and Bitting at one cent (1¢) except those members whom shall buy Founders stock as the only exception. 'Class A' special which shall be sold to the public in an amount determined by the Executive Committee and at a par value as determined by the Executive Committee. 'Class F' which shall be considered a part of Class A stock sold to the founders of which there shall be 600,000 shares only sold at a price of $1 but shall be participating and said $1 stock will be equal in participating as the Class 'A Special' to the public at large. 'Class B' common, having a par value of 1¢ per share with 1,000 votes for each share issued and outstanding. 'Class B' common stock shall be issued only to the Executive Committee of the corporation, of which Rose and Bitting are the original members. Ultimately 14,500,000 shares of Class A common and 500,000 shares of Class B common shall be authorized. All classes of stock shall be participating stock.

4. Upon incorporation Rose will execute a separate agreement of sale to the corporation all his rights in patent application No. 35559 of the United States Patent Office together with all the information pertaining to the same. Storage of this information and documents shall be with Rose. Bitting shall aid Rose in drawing up the sales agreement with the corporation within 10 days of the date of corporation. In addition, the corporation shall pay Rose a royalty of 10% net profits of the product covered by said patent. Rose shall also receive a 10% royalty on all other products developed or conceived by him, over and above the following salary.

5. Rose shall be President of the Corporation and Chairman of the Board of Directors and Director of Research. For his services he shall receive the sum of $100,000 per year payable in equal installments at least monthly. Bitting shall be Executive Assistant Chairman of the Board of Directors and Secretary-Treasurer of the Corporation and Vice President. For his services in organizing and producing Actasterin and future products discovered by Rose, he shall receive the sum of $75,000 per year payable in equal installments at least monthly. Salaries shall commence as of the date of incorporation when funds become available, provided that Rose has been paid for his patent first.

6. Bitting shall sell Founders stock for a flat rate of 12% for the amount he sells. If any other officer sells Founders stock then, he also, shall be paid 12% for the amount of shares he sells.

For Rose's research already done he shall be paid the sum of $100,000 in addition to what he is to be paid for his patent. The method of payment shall be the same as the separate document to be prepared by Bitting for the patent as previously stated.

7. Each officer may borrow an amout equal to one year's salary if approved by a majority of the vote by the Executive Committee.

8. Rose shall receive 300,000 shares of Class B common stock and Bitting shall receive 200,000 shares of Class B common stock. Each share shall have 1,000 votes. All other class of stock shall have one vote per share. Rose shall have the option to purchase 2,000,000 shares of Class A common stock at 1¢ per share, and Bitting shall have the option to purchase 1,500,000 shares of said stock at 1¢ per share, at any time within five years of the date of this agreement.

9. Each party shall cooperate to the fullest extent to prepare a proposed budget for the first year of operation of the corporation within 10 days hereof.

10. In the event of death or mental disability of any party then the surviving member or members may purchase all of the shares of the deceased or incompetent party from the estate at their market value as of the date of their death or incompetency, at any time within 6 months of death or incompetency.

11. It is understood that all parties shall retain their right to continue in their present business without prejudice to being able to draw 50% of their yearly salary in advance. They do agree that it is desirable to devote as much time as possible to the business of this agreement in the near future, but full time effort implied by this proviso is not mandatory.

12. It is contemplated that the parties will enter into a formal cross-purchase and/or redemption agreement with respect to said shares, which shall include the purchase of life insurance contracts in the amount of $250,000 each to fund part of such purchase or redemption to the deceased's widow.

Rose assigned his right, title and interest in the patent application to Pharmaco for $100,000 and for 10% of the net profits realized from the product.[11] This was the sole "asset" of Pharmaco.

13. Each party shall have the right to choose the assistant of his choice without prejudice from others.

IN WITNESS WHEREOF the parties hereunto set their hands and seals the day and year first above written.

Paul H. Rose (Seal)

Paul H. Rose, D.O.
Wayne S. Bitting (Seal)

Wayne S. Bitting

Rose further stipulates that this agreement supercedes any and all similar documents that might have been drawn.

The bank chosen in which the corporation shall bank its funds from the founders stock sold to them shall be the Suburban Bank of Norristown, Pennsylvania.

All checks drawn on the monies derived from the sale of stock must be signed by both Rose and Bitting in order to be valid."

The defendant Rose identified the above document in his deposition.

Q. Dr. Rose, would you examine plaintiff's Exhibit No. 13 and identify it?

A. This is an agreement made between myself and Mr. Wayne S. Bitting.

Q. Are you familiar with Mr. Bitting's signature?

A. Yes. I am.

Q. And is that his signature which appears on Plaintiffs' Exhibit No. 13?

A. It appears to be, yes.

Q. Has that agreement been amended or modified or superseded by another agreement?

A. Not that I recall.

Q. If it had been, would a copy of the agreement be among the corporate records in the possession of your Counsel, Mr. Thorn?

A. I assume Mr. Thorn would know if there had been.

MR. FARMER: Mr. Thorn, can we stipulate as to whether—

MR. THORN: I didn't prepare that agreement. But, to the best of my knowledge, it has not been amended.

MR. FARMER: And you do not have in your possession—

"MR. THORN: Any amendment to it? No. I don't."

Rose, pp. 28, 29.

11. The assignment of Patent application provides:

"ASSIGNMENT OF PATENT APPLICATION NO. 35559

WHEREAS, I, Paul H. Rose, D.O., residing at Audubon, Pennsylvania, did file a patent application No. 35559 with the United States for a drug for the treatment of arthritis and rheumatic diseases; and

WHEREAS, I, the said Paul H. Rose, am now the sole owner of the said patent application and of all of the rights therein; and

WHEREAS, by agreement dated June 26, 1970, I agreed to assign all of my right, title and interest in said patent application to PHARMACO-DYNAMICS, INC., a corporation organized and existing in the State of Delaware:

Now THEREFORE, TO ALL WHOM IT MAY CONCERN, be it known that, for and in the consideration of the sum of one hundred thousand ($100,000) dollars to be paid to me as funds became available to PHARMACODYNAMICS, INC., and the payment to me of 10% of the net profits realized from the product covered by said patent application, to be paid yearly, within seventy five days following the end of the fiscal year of the corporation, I, the said Paul H. Rose, have sold, assigned and transferred, and by these presents do sell, assign and transfer, unto the said PHARMACODYNAMICS, INC., the whole right, title and interest in and to the said patent application; the same to be held and enjoyed by the said PHARMACODYNAMICS for its own use and behoof, and for the use and behoof, of its successors and assigns, to the full end of the term for which letters patent may be granted as fully and entirely as the same would have been held and enjoyed by me had this assignment and sale not been made.

IN TESTIMONY WHEREOF, I have hereunto set my hand and seal at Audubon, Pennsylvania, this 2nd day of July, 1970.

In the presence of
Jeanne Arms

Paul H. Rose, D.O. (Seal)

Paul H. Rose. "

The defendant Rose identified the above document in his deposition.

"Q. Dr. Rose, would you examine and identify Plaintiffs' Exhibit No. 14?

A. This is the assignment of Patent Application No. 35559.

That's my patent number.

Q. An assignment assigning your rights in that application—

A. Yes.

Defendants commenced to solicit purchasers and sell stock in Pharmaco, including $12,000 worth of stock to the three shareholders in this action.[12] The

> Q. —to Pharmacodynamics. Is that correct?
> A. Yes. It does.
> Q. Are there any other patents or patent applications on drugs which you have assigned to Pharmacodynamics, Inc.?
> A. No. There are not. That's the only one."

Rose, pp. 29, 30.

12. Plaintiff William Reube subscribed to 3500 shares of stock in defendant Pharmaco for $3,500.00, paid on July 2 and 7, 1970, to defendant Rose.

Plaintiff S. John Nitta subscribed to 7100 shares of stock in defendant Pharmaco for $7,100.00, paid on July 10 and 16, 1970, to defendant Rose.

Plaintiff David Nitta subscribed to 1500 shares of stock of defendant Pharmaco for $1,500.00 paid on July 10 and 16, 1970, to defendant Rose."

13. Rose, in his deposition identified receipts for the purchase of stock in Pharmaco that were sent by mail to the purchasers of the stock. Additionally, Rose identified correspondence between himself and the plaintiffs Nitta and Reube. Rose pp. 19–25.

A letter from Rose to Nitta provides as follows:

" DR. PAUL H. ROSE, D.O.
Physician and Surgeon

General Practice

Dear John:
Welcome to Pharmacodynamics! We are proud to have you as a member of the founders. Any friend of Bill Reubes is a friend of mine and I shall look forward to meeting you personally!

Mr. Funfer (the signer of your note for the number of shares belonging to you) is my personal friend and it is he whom is making it possible for you to buy in small lots.

If I sold to you myself, I would have to require a full block of 30,000 shares. His first name is Joe and he is a 'good Joe'. I'm sure you will like being in his block of stock. He just told me that this sale cuts down the amount of Founders Stock available in his block to 2500 shares. If you have a friend who wants this please phone me just as soon as you receive this. (over)

I will hold off until midnight of the 11th before closing out. Otherwise any

defendants utilized the telephone and mails in connection with the sale of stock in Pharmaco.[13] After the defendant received the $12,000 paid by the

buyer that wants in will have to buy 30,000 shares.

If one person we have in mind takes the remainder in the next very few days there will be *no* founders stock available at *less than $ 5/share*!!!! If this happens, when we go public your founders stock will *open* at *$25 per share*!! This is not bad for a few days waiting is it!!?

Thanks again and I will look forward to meeting you in person very soon.

> Best regards,
> Paul H. Rose, D.O.
> President;
> Pharmacodynamics, Inc."

A letter from Rose to Reube provides as follows:

PAUL H. ROSE, D.O.
Physician and Surgeon

General Practice

Dear Bill:
Congratulations on becoming a member of the team. It is highly possible this will go public at $8 making your 1500 shares worth $12,000. Even at $4 it will be worth $6,000 but we have about decided on $8 since this has become such a red hot stock. Notice that this is going through Mr. Funfer, a friend of mine who is splitting the block. Thats the only way we can do this.

If you have friends who want a small piece of this at this fantastically low price I have a very few thousand shares left at $1. Tell them that if they want in—or if you want a few more—I must know by this Friday as the deadline.

Thanks again—I'm very happy to have been of service to you.

> Paul.

P.S. All of these shares in the broken up block have to go through Mr. Joseph Funfer who has found the group. He is a close friend of mine."

A second letter from Rose to Reube provides as follows:

" PAUL H. ROSE, D.O.
Physician and Surgeon

General Practice

Dear Bill:
Congratulations on taking more stock and letting Mr. Nitta in on the fabulous deal.

plaintiff, this money along with that of other purchasers was deposited in Rose's personal account according to the terms of the agreement between Bitting and Rose.[14] No measures were taken by the defendants to comply with either state or federal securities regulations.[15]

Defendants Rose and Funfer *admit* their failure to disclose the following information:

1. That Pharmaco was to pay Rose $100,000 for assignment of the patent application;

2. That Pharmaco was to pay Rose 10% of the royalties from the patent application;

3. That Pharmaco was to pay Rose $100,000 "reimbursement" for research expenses;

4. That Pharmaco was to pay Rose a salary of $100,000 a year;

5. That Pharmaco was to pay Bitting a salary of $75,000 a year;

6. That Rose and Bitting were to receive a special class of shares that had 1000 times as many votes as the class of shares sold to plaintiffs;

7. That Rose was to be paid $100,000 for the assignment of the patent application out of the proceeds from stock sales.

These facts are set forth in the agreement between defendant Bitting and

---

On this block there remains about 3 to 4 thousand more shares which will not be available at $1 any later than 7–9–70.

A nationally known doctor at Temple University Medical School is finishing the studies and when his article breaks in the Journals next month—*no* share will be worth less than $25 as we see it now.

Mr. Bitting and I are going to stop selling until that report is published. The results are unquestionable
(over)
We would be fools to sell $25 stock for $1. We will, however, go ahead and finish this block which contains the 4 thousand left. If *any* of your friends want in—they have until midnight tomorrow and that *it*!

Best regards,
Paul "

There can also be no doubt that the defendants used intrastate telephone calls in connection with the sale of stock in this case.

(a) Rose at p. 88:

"Q. Did you ever make contact with David Nitta?
A. I was introduced on the telephone to [sic] his father."

(b) Rose at p. 89:

"Q. Is it possible [that] you had a telephone conversation with John Nitta . . . ?
A. . . . [A]t Lansdale, I did, yes . . . . "

(c) Rose at p. 98.

"I never spoke to Mr. Nitta in my life personally until the last directors meeting. The only time I had spoken to him was by telephone."

(d) Rose at p. 99.

"Anyway, I said, 'I am very happy to meet you by telephone.'
\*　　\*　　\*　　\*　　\*
'I will look forward to some day your being one of the directors in the company' "

14. Rose, p. 73:
"Q. What happened to the proceeds of the money taken in from people who wanted to buy shares of stock, the $29,-400.00?
A. I applied it to the purchase price of my patent.
Q. I see. So it went directly to you from Pharmacodynamics in payment for part of the purchase price of your patent?
A. That's right.
Q. I see.
A. I certainly don't feel that I should give something as valuable as this away, as valuable as I feel it is going to be.
Q. All right.
A. I just don't feel like I want to give it away."

The defendant Rose in an affidavit in support of his motion to dissolve the attachment of his bank account states:
"3. That on or about July 2, 1970, he assigned all of his right, title and interest in and to a certain patent pending to Pharmacodynamics, Inc., in consideration of the sum of $100,000 and a royalty based on future sales;
4. That in part payment for said assignment he received approximately $29,400, part of which sum is represented by the checks of plaintiffs;
"5. That said sum was deposited in one of the accounts referred to in the report of the garnishee, Continental Bank."

15. Rose at pp. 101–106.

Rose. See, f. n. 10. Defendants specifically admit that no disclosure of any of these facts was made to plaintiffs even though the agreement was made prior to their purchase of shares in Pharmaco. The deposition of Funfer at pp. 46–48 provides:

"Q. Okay. And what did you do when you took the subscription to the stock?

A. What did I do?

Q. Did you go to the people's homes or meet them someplace, and what did you say?

A. Oh, I told them that the doctor had a good product that was going to make money.

Q. What did you tell them about the drug?

A. Well, it was effective.

Q. You told them that the drug was effective?

A. Yes.

Q. Did you tell them that there was a patent on it or you assumed there would be a patent on it?

A. I told them there was a patent pending.

Q. A patent pending.

What did you tell them about the effectiveness of the drug?

A. Well, it stopped the pain of arthritis, and it removed—removed all symptoms of arthritis—swelling, pain—

Q. Did you tell them—

A. —stiffness.

Q. —Pharmacodynamics, Incorporated had agreed to pay Dr. Rose $100,000.00 for research?

A. No.

Q. Did you tell them that Dr. Rose was going to have the controlling stock interest in Pharmacodynamics?

A. No.

Q. Did you tell them any details about the corporate arrangements of Pharmacodynamics between yourself, Dr. Rose, and Mr. Bitting?

A. Yes. I—

Q. What did you tell them?

A. —told them who the officers were.

Q. Did you tell them anything else other than who the officers were?

A. (No response)

Q. Did you tell them what the salaries of the officers were?

A. No."

The deposition of Rose at pp. 92–97 provides:

"Q. When Reube bought or before he bought, did you show him any of the papers for the corporation, the agreements, and so forth?

A. No.

Q. All right. Did you explain to him anything about the set-up of the corporation and how much it was going to pay for the patent and all that?

A. He didn't ask.

Q. All right. I guess, then, no prospectus was issued in connection with the sale, with the offering?

A. Oh, no. We weren't at any prospectus stage. It was just a private offering.

Q. All right.

A. I mean, we were not ready to offer anything to the public.

Q. Was there any registration with either the Securities and Exchange Commission or the Pennsylvania Securities Commission?

A. No. This was strictly private.

Q. Has there been any?

A. Not that I know of.

Q. Would it come to your knowledge if there were any?

A. I am sure it would—

Q. All right.

A. —But this was on a very private offering.

Q. So is it fair to say that when Mr. Nitta and Mr. Reube bought their stock, you had not taken any action to make them aware of the terms of your agreement with Mr. Funfer and Mr. Bitting and all that kind of thing?

A. Nothing like that had been asked.

Q. And you had not volunteered it?

A. No.

Q. So, basically, what they were told was that you had this invention and that the company was going to exploit it and that they could buy stock?

A. Mr. Reube was enthused about the stock he was getting. He sold Mr. Nitta. I never heard of Mr. Nitta until here comes the check.

Q. Before they bought their stock, did you discuss with them the fact that you had a patent? Did you say you had a patent?

A. They asked me if I had applied for a patent.

I certainly have, as I said.

Q. Did they—

A. They asked to see the patent number, which I showed them.

Q. That was the application"?

A. Yes. That satisfied them.

Q. By "them", you mean John Nitta and William Reube?

A. Yes.

Q. Did you tell them that the patent had been granted—

A. Oh, no.

Q. —or did you say it was just an application?

A. No.

I said it had been applied for. This seemed to satisfy them.

Q. All right.

A. They did ask if it had been researched through the Library of Congress, and I showed them that it had.

Q. What did you say, if anything, to John Nitta and Mr. Reube regarding what the money was to be used for from the sale of stock?

Did you get into that, or—

A. We didn't get into it.

We were really going to found the company with it.

Q. But at that time, the company was already in existence. Isn't that right? The company came into existence, as I understand it, the preceding month, in June?

A. Yes. Well, we were forming the company, yes.

Q. And the agreements with Bitting and Funfer had already been worked out?

A. They had already been worked out, yes, and we were just going to go from there.

Q. Did the same thing happen with the monies as you have described to me so far with respect to the other shareholders who eventually put in the rest of the money—

A. Yes.

Q. —up to $29,400.00?

A. Yes. There was a risk element, but it was one that the people were willing to take because they felt that the drug merited a very wide usage—

Q. All right.

A. —and that we were going to see wide usage of it, and I believe personally that it will rewrite a section of the textbook on inflammation.

Q. Did you provide them or any of the other shareholders with copies of the articles of incorporation or any of the agreements with respect to Pharmacodynamics, Inc., before they bought into Pharmacodynamics, Inc.?

A. No.

Q. Did you get into the salaries you and the other officers were to be paid?

A. No.

Q. Did you get into the subject of how much money Pharmacodynamics was going to pay for the patent?

A. No.

Q. Did you get into the subject of the $100,000.00 you were to be paid for research?

A. No."

These are what we feel to be the more salient features of this case. Defendant Rose, however, relies solely on the general denial in his answer and on unsworn factual assertions in the brief submitted by his counsel in an attempt to raise factual issues and oppose plaintiffs' motion for summary judgment.

Fed.R.Civ.P. 56(e), 28 U.S.C., provides:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Fed.R.Civ.P. 56(c), 28 U.S.C., provides:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■ Defendants' unsworn assertions that specifically contradict sworn testimony submitted by plaintiffs must be disregarded. See, S. E. C. v. American Beryllium & Oil Corp., 303 F.Supp. 912 (S.D.N.Y.1969); 6 Moore's Federal Practice, ¶¶ 56.04 [1]; 56.11 [1]–[7]; 56.15 [1]–[8]. However, all facts presented have been gleaned from the exhibits identified by the defendants and the testimony of the defendants when their depositions were taken. With that admonition in mind we may now proceed to determine whether the court may render judgment for the party entitled thereto as a matter of law.

SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, 15 U.S.C. § 78(j), AND S.E.C. RULE 10b–5, 17 C.F.R. § 240, 10b–5.

Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, makes it unlawful "for any person, directly or indirectly," to "employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of any rule "the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." One such rule so prescribed is Rule 10b–5. This declares that, in connection with the purchase or sale of any security, by the use of any means or instrumentality of interstate commerce, or of the mails, it shall be "unlawful for any person, directly or indirectly," (1) "To employ any device, scheme or artifice to defraud," (2) "To make any untrue statement of a material fact" or to omit to state a material fact so that the statements made "in the light of the circumstances", are not misleading, and (3) "To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person".

■■ Use of the telephone in connection with the sale of a security constitutes the use of an instrumentality of interstate commerce which can form the basis of a suit under Rule 10b–5. Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); Nemitz v. Cunny, 221 F.Supp. 571 (D.C.Ill.1963). Further, such a basis is established even if the telephone call made is intrastate rather than interstate. Myzel v. Fields, *supra*; Nemitz v. Cunny, *supra*; Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D.Ohio 1964). Nor, is it necessary to show that the telephone was used to communicate actual fraudulent statements or misrepresentations, any use of the telephone in connection with the sale of a security suffices. Cf., Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965). Finally, regardless of what transpired by use of the telephone, defendant Rose admits using the mails to send plaintiffs their stock receipts and to send notes to plaintiffs soliciting more purchases. See, Stevens v. Vowell, *supra*.

■ A private right of action arises once facilities of the mail or interstate communications are used in connection with the sale or purchase of securities

even though between the buyer and seller directly and not through a securities exchange or an organized over-the-counter market. Once jurisdiction attaches, the full requirements and regulations of the pertinent sections of the various Securities Acts are applicable. See, Hooper v. Mountain States Securities Corporation, 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa.1946); McClure v. Borne Chemical Co., Inc., 292 F.2d 824 (3d Cir. 1961), cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

■ There are sufficient undisputed facts in the record to support federal jurisdiction in that the use of an interstate instrumentality and the mails provided the means to effectuate the transactions in question.

This case involves primarily a failure to disclose to plaintiffs certain agreements between the incorporators of Pharmaco. That this information was material is beyond question. See, Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Securities & Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968), cert. denied, Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Affiliated Ute Citizens v. United States, *supra*.

■ The defendants actively encouraged the sale of Pharmaco securities. They personally solicited purchasers of the stock.[16] Under such circumstances it

16. See, f.n. 13. Rose at pp. 89–92.
Q. What conversation have you had with Mr. Reube regarding the sale of securities in Pharmacodynamics?
What date, for instance, do you think you had your first conversation?
A. I don't know exactly.
It was sometime in July.
Q. All right.
A. I was treating Mr. Reube at the time, in July, with this medicine, by his agreement.
Q. All right.
A. And he was so enthused by the results that he was getting from it that he asked me if stock was going to be available, and I said, well, yes, sometime in the near future.
Q. All right.
A. And he said, well, could he get some of the first stock that was issued, the founders' stock.
Q. All right.
A. This was all new to me because I know nothing about stocks and bonds, but—
Q. Was there more than one conversation like that in the month of July?
A. A couple, maybe. I guess.
Q. Did you say an ˀˀˀ ˀg to him about, you know, how �ˑˑ ˀul you thought the stock would be iˑ ˀt were offered to the public?
A. Yes. Sure. I told him that I thought when it hit the public eye—
Q. All right.
A. —whenever that time came, it would go over like gangbusters.

Q. Did you have any idea what it might sell for when it was offered?
A. I thought it would go at several times what we were asking.
Q. I forget what it was per share?
A. A dollar a share.
Q. Did you think it might go for $10.00 or $25.00?
A. I think so.
Q. Did you tell him that in conversations in July, before he bought?
A. Yes.
They tell me, from what I have learned since about stocks, that founders' stock is always offered at a very cheap price because there is an element of risk involved, so this went pretty cheap at a dollar a share.
Rose at pp. 107–109.
Q. At the time, in July, when you were talking to these people who ultimately invested about $29,000.00 for securities, did you mention anything to them about interest in the patent of drug companies?
A. I don't understand that.
Q. I'm sorry. I'll rephrase the question and try to make it clearer.
In talking with people who bought stock or who paid money toward stock, did you discuss with them whether or not you had contacts with drug companies who were interested in the patent rights or the marketing of the drug?
A. I may have. I don't know. I may or not have mentioned that Lilly had contacted me. Probably I did. I don't know.

Q. Did you say anything to them about how many other shareholders were interested in the company?

A. No.

You have to realize that, all of the time that this was going on, I was conducting a very busy practice and trying to run a—be a part of a company that was just getting started, and I was run ragged, and to ask me specifically when this and when that happened, you have lost me, because my practice kept me too busy.

Q. All right. Do you remember whether you discussed in July with the people who purchased stock how much money was going to be needed for the whole venture to succeed?

A. No.

The only thing that was ever asked me is how much is a block of stock, and I told them $29,000.00, and this kind of widened the eye balls of most of them. And they asked me if they could buy part of a block, and I said, yes, this had been done, and that culminated the conversation.

Q. But you didn't volunteer any information about what it would take for the patent, the whole thing, to go through for a successfuly (sic) marketing?

A. No, because at that time I didn't have any idea what it would take.

Q. Did you say anything to them about your company going public?

A. I don't recall.

Q. Would your conversation with the other shareholders who ultimately bought stock the way John and David Nitta and William Reube did have been substantially the same with all of them?

A. Very informal. Very informal. In fact, I would say that I haven't met personally but four or five of them.

Q. Most of it was by telephone?

A. No.

Mr. Funfer sold the rest of them. I didn't even know them personally.

Q. Did you have any discussion with Mr. Funfer about what he should or should not say about the company?

A. No. I did not.

The only thing that was ever discussed was the wording of this thing (indicating) here, and that was Mr. Bitting's idea.

Rose at pp. 122–125.

Q. Approximately how many of the shareholders are or were patients of yours?

A. Percentage-wise, I would say seventy-five per cent.

Q. And I think you have testified that these people asked you about investing in the drug. Is that correct?

A. That's correct.

Q. All right. Did you talk to anyone other than them about investing in the company?

A. No. I haven't.

Q. Do you know whether Mr. Funfer has talked to anyone other than the shareholders about investing in the company?

A. I don't know that. I think he has.

Q. Do you have any idea how many people he might have spoken to?

A. Mr. Funfer, I would say, spoke to fifteen—between fifteen and twenty people.

Q. And are most of the shareholders people to whom he spoke?

A. Yes.

Q. In other words, they were patients of yours, but he is the one who discussed with them the purchase of the stock in Pharmacodynamics?

A. That is correct.

Q. Has anyone else spoken to any other persons about investing in Pharmacodynamics that you know of?

A. Not that I know of.

They are quite an enthused little group.

Q. Is any of the money now in the two bank accounts which have been attached any part of the funds that you received on account of the patent application?

A. No. It is not. It has been all used long ago.

Q. What is the source of the funds that are presently in the two accounts?

A. From my private practice.

Q. Fees from patients?

A. Yes, sir.

MR. THORN: I have no further questions.

BY MR. FARMER:

Q. You stated that seventy-five per cent of the people who bought stock were patients of yours?

A. Approximately.

Q. And they, according to you, learned of the drug and the company when you were talking to them while they were in for treatment. Is that correct?

A. Yes.

Q. How did the other twenty-five per cent who were not your patients learn about the company?

A. By Mr. Funfer.

Q. Do you know how he made contact with them?

A. They were personal friends of his, as I recall."

was incumbent upon them to disclose all material information. Affiliated Ute Citizens v. United States, *supra*; Stevens v. Vowell, *supra*. These omissions coupled with positive representations extolling the virtues of Pharmaco and the defendants' conduct disclose a "course of business" or a "device, scheme or artifice" that operated as a fraud upon the purchasers of Pharmaco stock. The defendants failed to disclose material facts that reasonably could be expected to influence the decision to invest in Pharmaco.[17] It appears that the patent application had, at best, doubtful economic worth.[18] If at all, the defendant Rose knew that the alleged invention could not be economically exploited for a long time.[19] At the same time the defendants made predictions as to the likelihood of appreciation in value of the stock without adequate basis for such predictions.[20]

 It has been repeatedly stated that the fundamental purpose of the 1934 Act is to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry. Securities & Exchange Commission v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). This fundamental purpose is equally applicable to a purely private securities transaction. Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." Id., at 195, 84 S.Ct. at 285. For the foregoing reasons, it is the view of this Court that summary judgment is appropriate in this case.

**ORDER**

And now, this 28th day of June, 1972, it is hereby ordered that:

1. On the issue of liability summary judgment is granted.

2. The defendants' motion to intervene and dissolve the attachment is denied.

The Court reserves ruling on the damage aspect of this case pending receipt of briefs on that issue.

## SUPPLEMENTAL MEMORANDUM AND ORDER

On June 28, 1972, Summary Judgment was granted against the defendant for violations of the anti-fraud provisions of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule X–10B–5 promulgated under that Act, 17 C.F.R. § 240.10b–5. The only remaining issue is the question of damages. The Court permitted the submission of supplemental affidavits and briefs on this issue. Defense counsel was unable to reach his client and failed to submit any affidavits or brief in opposition to plaintiff's. There being no substantial dispute on the question of damages, judgment shall be entered in favor of plaintiff.

## PLAINTIFFS ARE ENTITLED TO RECOVER THE PURCHASE PRICE OF THEIR STOCK, WITH INTEREST.

 Plaintiffs are entitled to recover the amount of money paid for their stock, plus simple interest at a rate of

17. The obligation to disclose and the withholding of material information coupled with active solicitation of purchasers of Pharmaco stock, establish the requisite element of causation in fact. Had the defendants disclosed that proceeds from the sale of stock would go directly to Rose as payment for the assignment of his patent application to Pharmaco, and that any commercial development of the drug was remote, it is unlikely that plaintiffs, and especially unlikely that a reasonable investor would have put any money into Pharmaco. The defendant here took advantage of his position as the treating physician of many of the present stockholders in Pharmaco. That they themselves may have been impressed with Rose and the drug is no excuse for the conduct herein described.

18. See, 35 U.S.C. §§ 101, 102, 103.

19. See, f.n. 7.

20. See, f.n. 13.

6% from the date of their purchase.[1] The amounts paid by each of the plaintiffs and the dates of their purchases are as follows:

| | |
|---|---|
| William Reube | $3,500 (July 2 and 7, 1970) |
| S. John Nitta | $7,500 (July 10 and 16, 1970) |
| David Nitta | $1,500 (July 10 and 16, 1970) |

## PLAINTIFFS ARE ENTITLED TO FEES AND COSTS

Recovery of costs and attorney's fees is expressly provided as a remedy for violations of the Securities Act of 1933. The reasons set forth in the opinion of the Court dated June 28, 1972, support a finding that defendant violated the anti-fraud provisions of Section 17(a) (1), (3) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1), (3). See, Dorfman v. First Boston Corporation, et al., 336 F.Supp. 1089 (E.D.Pa.1972); Juster, Inc. v. First Boston Corporation, et al., 336 F.Supp. 1089 (E.D.Pa.1972).

 In order to recover fees and costs, the successful litigant in an action under the 1933 Act is required to show that his opponent's position was "without merit". Section 11(e) of that Act, 15 U.S.C. § 77k(e), provides as follows:

". . . In any suit under this *or any other section* of this subchapter the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees, and if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, such costs may be assessed in favor of such party litigant (whether or not such undertaking has been required) if the court believes the suit or the defense to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit, such costs to be taxed in the manner usually provided for taxing of costs in the court in which the suit was heard." (Emphasis added)

 Again, for the reasons set forth in our opinion dated June 28, 1972, an award of costs and reasonable attorney fees shall be made as provided for in Section 11(e) of the 1933 Act, 15 U.S.C. § 77k(e).

---

1. See, Sackett v. Beaman, 399 F.2d 884 (9th Cir. 1958); Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969).