Don REPASS, Vernon Schoeman, Marion H. Renz and Ralph Buhrmaster, Plaintiffs,

v.

Merlin E. REES and William E. Meakins, Defendants.

Civ. A. No. 5679.

United States District Court District of Colorado.

June 2, 1959.

Dayton Denious and Omer Griffin, Denver, Colo., for plaintiffs.

Holland & Hart and Philip A. Danielson, Denver, Colo., and Gene E. Fischer, Fort Collins, Colo., for defendants.

ARRAJ, District Judge.

This action arises out of one transaction between the plaintiffs and defendants, and a second transaction between plaintiffs' Renz and Buhrmaster and the defendants. Respectively, the plaintiffs are individually seeking to rescind the two transactions whereby they had purchased undivided fractional interests in three oil and gas leases, and to recover the consideration paid to the defendants.

The plaintiffs claim relief on three separate grounds, two of which are under the Securities Act of 1933, as amended, 15 U.S.C.A. §§ 77e and 77l(1), and 15 U.S.C.A. § 77l(2). The third ground is based on an alleged violation of the Iowa Securities Law, Chapter 502.23, 1954 Code of Iowa, I.C.A. Due to the disposition herein made of the case, it is deemed unnecessary to consider the alleged violation of 15 U.S.C.A. § 77l(2), or the alleged violation under the Iowa Securities Law. Jurisdiction is based on 15 U.S.C.A. § 77v.

The pertinent facts are:

The plaintiffs are residents of Waterloo, Iowa, and the defendants are residents of Ft. Collins, Colorado.

Previously, defendant Rees had been a resident of Waterloo, at which time he had been acquainted with plaintiffs Renz, Repass and Schoeman. He had not previously known plaintiff Buhrmaster. Defendant Meakins had not been acquainted with any of the plaintiffs.

In March of 1956, defendants traveled by automobile from Ft. Collins to Cedar Rapids, Iowa, the purpose of the trip being to sell undivided interests in oil and gas leases on lands in the State of Nebraska in order to raise money for drilling wells on lands covered by the leases. During this trip defendants stopped in Waterloo. While there, on March 21, 1956, the defendants sold to the plaintiffs fractional undivided working interests in two oil and gas leases, the defendants agreeing to have two test wells drilled—the wells to be on land covered by each of the leases. The land under both leases is in Kimball County, Nebraska, the first lease covering W ½ NE ¼ and E ½ SE ¼ of Sec. 8, T 16 N, R 56 W, 6th P.M., the other lease covering E ½ SE ¼, and E ½ SW ¼ of Sec. 7 and W ½ NE ¼ and W ½ NW ¼ of Sec. 18, T 12 N, R 56 W, 6th P.M. The well on the first lease was to be called the "Barrett" and the well on the other lease was to be called the "Mockett No. 1."

The plaintiffs bought the following percentages of the working interests in the two leases and paid at the rate of $800 for each percent:

| | |
|---|---|
| Repass | 2% |
| Renz | 4% |
| Buhrmaster | 4% |
| Schoeman | 5% |

a total of 15%. The entire price for the 15%, $12,000, was paid by two checks for $6,000 each drawn by Renz on an account maintained by him in a Waterloo bank under the name of "Taylor's." The other plaintiffs reimbursed Renz in the

respective amounts payable for the respective percentages purchased by them. Immediately upon returning to Colorado, defendants deposited one of the checks in a Ft. Collins bank. The other check was held for approximately a month in order to allow time for funds to be deposited in the "Taylor's" account, and was then deposited in a Ft. Collins bank. Each check was forwarded to Iowa for clearance and payment in the usual course of business.

It had been agreed that the money paid for the fractional undivided working interests would be used to drill the two test wells. The two wells were drilled, and were dry holes. The "Barrett" well was drilled and abandoned on or before April 17, 1956, and the "Mockett No. 1" was drilled and abandoned on or before April 30, 1956. The plaintiffs received no income from these wells.

The defendants sold fractional undivided interests in the two oil and gas leases to no more than nine persons. They had also stated that they each would keep a 5% working interest and would put in the same money as they had asked the others to put in.

Later, in May of 1956, Rees, while traveling by automobile from Ohio or Michigan to Colorado, stopped in Waterloo and spoke to plaintiffs Renz, Buhrmaster and Schoeman about a further purchase of undivided interests in a third oil and gas lease on which was to be drilled a third well known as "Mockett 1-A." The land under this lease is also in Kimball County, Nebraska, the lease covering the W ½ NE ¼, E ½ SE ¼ and E ½ SE ¼ of Sec. 12 and W ½ NE ¼, E ½ SW ¼ and E ½ SE ¼ of Sec. 13, T 12 N, R 57 W, 6th P.M. On or about May 18, 1956, Rees from Colorado telephoned Buhrmaster and Renz in Waterloo regarding this third lease. The program was stated to be the same as that for the first two wells, except that the cost was $400 for each one percent interest instead of $800. In the telephone conversation Buhrmaster and Renz each agreed to take 7½%—a total of 15%. A check for $4,000 was drawn on Taylor's and mailed to Ft. Collins on May

18, 1956. Another check drawn on Taylor's for $2,000, the balance of the consideration, was mailed to defendants in Ft. Collins on May 19, 1956. The defendants received these checks and deposited them in a Ft. Collins bank where they were returned to Iowa for clearance and payment in the usual course of business.

The "Mockett 1-A" well was drilled and was a dry hole. The plaintiffs Renz and Buhrmaster received no income from this well.

The defendants sold fractional undivided interests in this lease to no more than four persons.

On June 4, 1956, defendants executed or caused to be executed assignments of interest in the lease covering the "Barrett" well. On the same day, defendants mailed these assignments to plaintiffs. On July 24, 1956, the same was done concerning assignments of interest in the "Mockett No. 1". And the same procedure was followed on September 27, 1956, regarding assignments of interests to plaintiffs Renz and Buhrmaster in the "Mockett 1-A" lease. These assignments called for the agreed percentages. However, the percentages were not of the working interest itself, but only of a percentage of Rees' and Meakins' interest, which was 40% of the working interests.

The plaintiffs, who are all experienced businessmen and experienced investors, each claimed all or nearly all of his payment as a deduction in their income tax returns, each claiming the deduction on a different basis. They brought this action on May 8, 1957, more than one year after delivery and deposit of the checks given in connection with "Barrett" and "Mockett No. 1", less than one year after the payment in connection with "Mockett 1-A", and less than one year after the execution and mailing of the assignments on all the leases. The plaintiffs tendered the assignments from defendants to themselves into Court.

The defendants admit that these assignments of fractional undivided interests in the oil and gas leases are "securities" within the meaning of the Securities Act of 1933. They also admit

that they did not register these securities with the Securities and Exchange Commission. The pertinent statutes are:

15 U.S.C.A. § 77e:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

\* \* \* \* \* \*

"(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title. As amended Aug. 10, 1954, c. 667, Title 1, § 7, 68 Stat. 684."

15 U.S.C.A. § 77d:

"The provisions of section 77e of this title shall not apply to any of the following transactions:

"(1) Transactions by any person other than an issuer, underwriter, or dealer; transactions by an issuer not involving any public offering;"

15 U.S.C.A. § 77l:

"Any person who—

"(1) offers or sells a security in violation of section 77e of this title.

\* \* \* \* \* \*

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security. As amended Aug. 10, 1954, c. 667, Title I, § 9, 68 Stat. 686."

15 U.S.C.A. § 77m:

"No action shall be maintained to enforce any liability \* \* \* created under section 77l(1) of this title, unless brought within one year after the violation upon which it is based."

The defendants assert the following defenses:

I. That no sale was made by the use of interstate commerce or any of the instrumentalities thereof, or the mails.

II. That any liability arising under the sale on March 21, 1956, viz., the sale of the "Barrett" and the "Mockett No. 1", is barred by the statute of limitations.

III. That any interests sold by the defendants to plaintiffs were exempt from registration under the provisions of the Securities Act of 1933 by reason of the fact that all transactions were a part of a non-public offering.

IV. That even if there is a violation of the Act, plaintiffs are not entitled to anything since no consideration was paid for the securities, all the money having been paid as consideration for defendants' agreement to drill the three test wells.

V. That there was an insufficient tender of the securities into Court.

Each of these defenses will be discussed separately.

### Defense I.

 *First transaction*: The fact that the defendants sold securities involved in the first transaction while traveling from

one state to another in an automobile for the express purpose of selling those securities does not establish a violation of the Act. The use of one's personal car in such a situation is not the use of an "[instrument] of transportation * * * in interstate commerce." This also holds true in regard to the transportation of the checks given to defendants by plaintiffs from Iowa to Colorado where the defendants deposited them in a bank. Nor is there a use of an instrument of interstate commerce when those checks were sent back to the drawee bank in Iowa in the usual course of business.

■ However, the securities, i. e. the assignments, were mailed by defendants to plaintiffs. This is a use of the mails for the purpose of a delivery of the securities after sale. And the defendants certainly caused the securities to be so carried. Since the defendants had not registered the securities, this is a violation of 15 U.S.C.A. § 77e(a) (2), Schillner v. H. Vaughan Clarke & Co., 2 Cir., 1943, 134 F.2d 875, 878; Dupler v. Simmons, D.C.D.Wyo., 1958, 163 F.Supp. 535; Gross v. Independence Shares Corporation, D.C.E.D.Pa.1941, 36 F.Supp. 541, 543, unless the securities are exempt from the registration requirements.

■ *Second transaction*: Here, the fact that negotiations for the sale were commenced while the defendant Rees was en route on an automobile trip through several states does not establish the use of an instrument of interstate commerce. However, the defendant Rees used an instrument of communication in interstate commerce when he talked by telephone with some of the plaintiffs: and this instrument was used either to sell or to make an offer to sell the securities either in violation of 15 U.S.C.A. § 77e(a) (1) or ‘Section 77e(c). Here, too, the securities were mailed to plaintiffs. This, as in the first transaction, is a violation of 15 U.S.C.A. § 77e(a) (2), Schillner v. H. Vaughan Clarke & Co., Dupler v. Simmons and Gross v. Independence Shares Corporation, supra, unless the securities are exempt.

### Defense II.

■ *First transaction*: The sale was on March 21, 1956. The securities relating to the "Barrett" were mailed on June 4, 1956, and the securities relating to the "Mockett No. 1" were mailed on July 24, 1956. The suit was commenced on May 8, 1957. As shown under the discussion of Defense I no violation of 15 U.S.C.A. § 77e occurred until the securities were mailed. Thus, the violation of 15 U.S.C.A. § 77l(1) did not occur until on or after June 4, 1956. This is within the one year prior to May 8, 1957; therefore, the statute of limitations had not run on this transaction.

■ *Second transaction*: There is no question but that the statute of limitations has not run on this transaction. If there was a violation of the Act at all, it had to occur within the year prior to the commencement of this action.

### Defense III.

■ "The statute does not define a public offering and no attempt has been made to judicially formalize it. We know, however, that a public offering is not necessarily a general offering to all classes. Its characterization does not turn on the number of persons to whom the offer is made —it may be applicable to a few or many. S. E. C. v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. At the same time, number, amount and manner of the offering are distinctly relevant. See Ruling of General Counsel for S.E.C. Jan. 24, 1935, Release No. 285, quoted in Campbell v. Degenther, D.C., 97 F.Supp. 975. *The accepted criterion is 'whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to ‘fend for themselves is a transaction "not involving any public offering."'* S. E. C. v. Ralston Purina Co., supra." (Emphasis supplied.) Woodward v. Wright, 10 Cir., 266 F. 2d 108, 115.

■ Here the plaintiffs were shown to be both experienced businessmen and experienced investors. As to them, this Court feels that they did not need the protection of the act in relation to these purchases. However, the burden of showing the lack of public need for protection is on the one claiming the exemption, here the defendants. Woodward v. Wright, supra; S. E. C. v. Sunbeam Gold Mines Co., 9 Cir., 1938, 95 F.2d 699. The defendants testified that they sold securities in the first transaction to no more than nine persons. And to no more than four persons in the second transaction. But there is no evidence as to the experience of the buyers other than the plaintiffs. And there is no evidence as to how many offers were made to other persons, or the experience of those persons. The defendants did not testify that they had made no other offers. Without such evidence in the record the Court cannot determine whether the class needed protection. It was incumbent on the defendants to submit this evidence. Since they did not, they must suffer the consequences.

## Defense IV.

The defendants claim that the money paid to them by the plaintiffs was for drilling costs and that there was no consideration for the assignments, or that the maximum consideration paid by the plaintiffs for the fractional undivided interests was $144, the balance of $17,856 being consideration for defendants' agreement to drill the test wells.

The defendants rely on the case of Hammer v. Sanders, 1956, 8 Ill.2d 414, 134 N.E.2d 509, which considered a similar question under the Illinois Securities Act of 1919. At pages 513–514 of 134 N.E.2d, the Court said:

"Piecing all this together, we believe the record shows clearly that the development contract aspects of the instrument were uppermost in the minds of the parties. The only sums advanced by the plaintiffs were for drilling costs—not in payment of shares in working interests. The transfer of a working interest, even if it be assumed that it was effective immediately upon execution of the instrument, merely served as a basis for agreeing on the drilling of a test well and for establishing the plaintiff's share of the oil, if and when produced. In effect, the parties, as co-owners of the working interest, were thereby enabled to form an association for oil development, with the ultimate profits to be distributed as their interests appeared. At best, the transfer of a working interest was incidental to the development contract.

\* \* \* \* \* \*

"The statute contemplates the return of money expended in purchasing the 'securities,' and it is the plaintiffs' burden to demonstrate a right to recover. In this regard, a basic distinction must be recognized here; namely, the difference between sums spent to *acquire the interest* and sums advanced to *exploit the property* (i. e., test for oil and gas). If a group of people own undivided shares of a working interest, an agreement among them to develop that property is clearly not within the purview of the statute. These 45 transactions are, in substance, of the same type, even though the transfer of the interest and the entering into of the contract for drilling may be said to occur simultaneously. For while there were many ways Sanders-Fye and the plaintiffs might have arranged for the transfer of the interests and the drilling of the wells, they in fact utilized but one method. And that, as related above and as borne out by the record, was to transfer a share of the working interest to one who was willing to exploit that property with them by contributing a proportionate share of the estimated drilling costs. Sanders-Fye were not brokers, and they expected profits from oil production, not from selling working interests. All sums

involved were advanced for and used in drilling, and this was fully understood by all parties concerned."

The plaintiffs in the case at bar were fully aware that the money, or the greater part of it, that they paid would be used to drill test wells, or, in other words, to exploit the property. The plaintiffs had deducted most of the sums paid on their federal income tax returns and for income tax purposes had not treated the expenditures as payments for securities or any other type of capital asset. This was also true in the Hammer case, and the Illinois Court seemed to treat it as a significant factor. However, this Court chooses not to follow the majority opinion in Hammer; we are persuaded to follow the logic and reasoning of the dissenting opinion in that case, where at pages 515–516 of 134 N.E.2d Justice Davis said:

"The history of the exploitation of oil and gas rights is one of great commercial and economic development with concurring wildcat speculation and fraudulent and deceitful promotions. '(It) has been accompanied by the creation of legal interests which are, in many respects, *sui generis*. The law relating to these interests combines familiar principles of the law of property, contracts, landlord-tenant, and tenancy-in-common; however, in no other field are they combined in the particular pattern and with the particular overtones that they are found in oil and gas law.' Bloomenthal, SEC Aspects of Oil and Gas Financing, 7 Wyo.L.J. 49.

"It was therefore reasonable and necessary that securities be defined so as to embrace every clear attempt to provide a type of 'security' investment regardless of the peculiar legal form of the transaction. In a situation similar to the one before us, the Supreme Court of the United States laid down a succinct but useful test, applicable here. 'The test is whether the scheme involves an investment of money in a common

enterprise with profits to come solely from the efforts of others.' Securities and Exchange Comm. v. W. J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244. In view of the salutary purposes of regulatory securities legislation, the term 'securities' has been given a broad and liberal construction. Securities and Exchange Comm. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88; Annotation 163 A.L.R. 1050 et seq. 'The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae.' Securities and Exchange Comm. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244. In determining whether a particular instrument is a security within the meaning of the statute, the substance of the transaction and the relationship between the parties will control as against the form of the alleged security. Securities and Exchange Comm. v. Universal Service Ass'n, 7 Cir., 106 F.2d 232, certiorari denied 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519.

And at page 517 of 134 N.E.2d:

"The form of the instrument does not in any way change the obvious practical and economic relationship of the parties. As was said by the Supreme Court of the United States in Securities and Exchange Comm. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 122, 88 L.Ed. 88: 'It is clear that an economic interest in this well-drilling undertaking was what brought into being the instruments that defendants were selling and gave to the instruments most of their value and all of their lure. The trading in these documents had all the evils inherent in the securities transactions which it was the aim of the Securities Act to end.'

"It seems to me that the majority has left the world of realism when they state that 'the development

contract aspects of the instrument were uppermost in the minds of the parties. The only sums advanced by the plaintiffs were for drilling costs —not in payment of shares in working interests.' The plaintiffs invested money, with the understanding that it would be used for drilling a well; but the drilling of the well, in itself, would benefit them not an iota unless they received, for that investment, a right to share in the oil benefits reaped by the drilling efforts of the defendants. There was no provision for further payment for the acquisition of a 'working share' but merely an agreement to pay certain set expenses upon production of oil."

Further at pages 517–518 of 134 N.E.2d:

"In my opinion, the fact that both parties sought to take advantage of the special provisions of the Internal Revenue Code does not militate against this view. The purposes and policies behind the deductions and exemptions allowed by our Federal tax laws are far different from those which form the basis of our Federal State and 'Blue Sky' laws. Even though the Congress of the United States sees fit to permit the deduction of these expenses, this circumstance neither lessens the imminent danger of fraud which our Securities Act was designed to prevent nor aids in their construction."

■ This Court is of the opinion that in the case at bar the "consideration paid" by the plaintiffs for the securities they purchased from the defendants was $18,000, the consideration paid by the respective plaintiffs being as follows:

| | |
|---|---|
| Renz | $6,200.00 |
| Buhrmaster | 6,200.00 |
| Schoeman | 4,000.00 |
| Repass | 1,600.00 |

From the foregoing, the Court must conclude that the defendants committed a technical violation of the Securities Act of 1933, and that their liability under 15 U.S.C.A. § 77l(1) is absolute, no exemption from the registration requirements having been proved. Respectively, the plaintiffs are entitled to recover the amount paid for said securities, together with interest thereon. The only question remaining is whether there has been a sufficient tender of the securities into Court.

### Defense V.

■ Although the defendants did not stress the insufficiency of the tender at the pre-trial conference, they did raise the question in their answer. In any event the Court will consider this question.

During the pre-trial conference, the plaintiffs tendered into Court the assignments from the defendants to the plaintiffs. During the trial, in open Court, the counsel for the plaintiffs stated that the plaintiffs would make any assignments back to the defendants that the Court might order.

Abstracts covering the "Barrett" and "Mockett No. 1" leases were introduced into evidence. These exhibits show that up to March 25, 1957, the plaintiffs had not placed their assignments of record. Also, the assignments themselves bear no recorder's mark, which is ordinarily placed on an instrument when it is recorded. Although no abstract of the "Mockett 1–A" lease was introduced, the assignments, likewise, bear no recorder's mark.

■ However, in order to insure the sufficiency of the tender, the Court will order in its decree that the plaintiffs' recovery will be conditioned upon an additional tender into Court of assignments executed by them conveying to the defendants all of their right, title and interest in and to the oil and gas leases described in said original assignments; said instruments of conveyance to carry a warranty that plaintiffs have not previously conveyed any interest therein.

■ The Court is of the opinion that plaintiffs are not entitled to an award for attorneys' fees in this action.

Inasmuch as this opinion contains a statement of the facts as found by the

Court and the Court's conclusions thereon, the Court is of the opinion that no formal findings of facts and conclusions of law need be entered.

Counsel for plaintiffs will submit an appropriate judgment and decree within 20 days.