## Warner v. Jordan

*Edward Fackenthal,* for plaintiff.
*Thomas Garrity,* for defendants.

TREDINNICK, J., June 27, 1973.—In 1967, defendant, Robert Jordan, then a sales manager with a cemetery corporation, conceived an idea for a pocket size burglar alarm, later known as "Mayday 11," which would automatically dial the police when activated. Defendant approached Electro-Nite Company with a prototype of this device. Upon convincing the company's president (a personal friend) of the product's potential, Jordan and the company entered into an agreement dated December 22, 1967, but effective January 1, 1968. Defendant thereby assigned all his rights in the device to the company for (1) the right to purchase 15,000 shares of unregistered stock of the company at $.10 a share, 3,000 shares available immediately upon execution, the remaining 12,000 shares in four yearly installments of 3,000 shares from January 1968, through January 1971, inclusive; (2) the right to purchase up to 10,000 shares under the company's stock option plan, 5,000 shares at $15 a share,

the other 5,000 at $15 or the market value, whichever was higher; (3) the unsalaried position of vice-president of Electro-Nite.

Plaintiff Warner, a stockbroker of some 40 years' experience and expertise in the securities field, was a very close personal friend of defendant. During a social visit, defendant told plaintiff of his activities with "Mayday 11." Warner was enthusiastic about the product's potential, and offered to help promote and market the device. Upon Jordan's authorization, plaintiff actively solicited outlets for the product on a commission basis.

In early April 1968, returning by train from a trip to New York for promotional purposes, Jordan offered to sell to Warner 1,000 shares of Electro-Nite "$.10 stock" for $16 a share, with settlement to occur September 1, 1968. Anticipating a sharp rise in the stock from its then value of $13 a share, Warner accepted. Later that evening, the oral agreement was modified, by telephone, to increase the number of shares involved to 2,000.

In succeeding months, the stock rose rapidly in value, and defendant, lamenting his earlier agreement with plaintiff, tried to get Warner to change the bargain, without success. Finally, after much discussion in person and by phone, plaintiff agreed to a modification whereby defendant was to (1) sell 6,000 shares of "$.10 stock" to plaintiff in installments of 1,500, each September from 1969 through 1972 inclusive, at $25 per share; and (2) in essence, divide whatever profits defendant might achieve by the purchase and resale of his alleged stock option to purchase 10,000 shares at $15 a share. As of September 1, 1968, the stock had a market value of $52.50 a share. These agreements were incorporated into two mutually dependent documents, the one relating to

the $.10 stock known as the "Purchase Agreement," the one dealing with the stock option being called the "Financing Agreement." The documents were prepared by a neutral attorney in September 1968, but backdated to April 9, 1968, in order to supersede the oral "train ride" agreement. They were executed simultaneously, each being a part of an integrated contract. Along with these documents, Warner signed an investment letter wherein he agreed his purchases were for investment purposes only, and not for resale. Defendant, in fact, did not have the option to purchase 10,000 shares of stock at $15 as he represented and set forth in the financing agreement, but rather had the option to purchase only 5,000 shares at $15; the option price for the remaining 5,000 shares was $15 or market, whichever was higher.

Jordan's self-expressed intent in entering into the aforementioned agreement was to sell one-half of his $.10 stock at $25 in order to hedge against loss if the stock dropped.

Once relieved of his obligation under the "train ride" agreement, defendant proceeded to sell, from August 1968 through October 1968, 2,900 shares of the initial 3,000-share block of "$.10 stock," the vast majority being sold to unknown buyers over the counter through a brokerage firm recommended by plaintiff. In 1969, defendant likewise disposed of most of the 1,500 shares that were not obligated to plaintiff. By September 1969, when Warner was to make his first purchase from Jordan, the stock had dropped from about $60 a share to $12 a share. Plaintiff nevertheless purchased the shares in accordance with the agreement. Defendant tendered "legend" stock, held in the name of Robert and Phyllis Jordan. Plaintiff refused the tender, insisting on unlegend shares. Defendant complied with that demand. Warner did

not have sufficient cash to make full payment of the purchase price and the parties therefore agreed that he pay $23,500 down and $2,000 a month for seven months. Plaintiff immediately sold the shares for a total consideration of $18,375, made the downpayment and, subsequently, the monthly installments.

By September 1970, when plaintiff was obligated to make his second purchase from Jordan, the stock had plummeted to $3 a share. Professing a total inability to pay, plaintiff asked defendant to release him from his contract. Defendant refused. Warner then went to the President of Electro-Nite, Lawrence Littman, and tried to persuade him to have the company exercise its right of first refusal so as to make performance of the agreement between the parties impossible. This request was also refused. It was during these discussions with Littman that plaintiff discovered defendant did not have the option to purchase the full amount of 10,000 shares at $15 a share. Plaintiff thereafter refused to honor the agreement and commenced this action.

Plaintiff sought to set aside the written agreements on two bases: (1) that the sale of unregistered stock by Warner to the plaintiff constituted a violation of section 5 of the Securities Act of May 27, 1933; and/or (2) that plaintiff was induced to enter into the written agreements by defendant's misrepresentation of his rights under the Electro-Nite contract. Plaintiff sought damages in the sum of $19,500 plus interest, this being his loss in respect to the 1,500 shares purchased by him from defendant. Further, plaintiff claimed the invalidation of the written agreements revitalized the oral "train ride" agreement, and he was thus entitled to recover the profit he would have made had that agreement been carried out, a figure claimed to be $72,750.

.

Defendant denied any violations of the Securities Act, and counterclaimed for $112,500 as damages for plaintiff's alleged breach of the written agreements.

After trial before the undersigned sitting without a jury, a verdict was entered in favor of plaintiff, David Warner, and against both defendants, Robert and Phyllis Jordan, in the amount of $23,607, representing the $19,500 plus interest. Plaintiff's claim for $72,750 as profits he might have obtained under the pre-existing oral contract was denied. Plaintiff has not filed any exceptions to the trial judge's verdict, thus making it unnecessary to discuss the rationale for that phase of the decision.

Defendant filed exceptions alleging the verdict was against the evidence, the weight of the evidence, and the law. The matter, having been argued before the court en banc, is now ready for disposition.

Initially, we must consider whether the written agreement concerning the sale and purchase of 6,000 shares of defendant's $.10 unregistered stock in four annual installments violates section 5 of the Securities Act of May 27, 1933, c. 38, Title I, sec. 5, 48 Stat. 77, 15 U.S.C. §77(e).

That section provides, in its relevant part, as follows:

"Section 5(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person directly or indirectly—

"(1) to make use of any means or instrument of transportation or communication in interstate commerce or of the mails to sell such securities through the use or medium of any prospectus or otherwise."

Plaintiff presented at trial a prima facie case of violation of that statute, by establishing that defendant sold him unregistered securities and that an instrument of communication in interstate commerce, the

telephone, had been employed in so doing: Repass v. Rees, 174 F. Supp. 898 (1959). Even if all the phone calls took place within Pennsylvania, the interstate commerce requirement has been met, for it is the character of the instrument used, rather than the nature of the call which is determinative: Lennerth v. Mendenhall, 234 F. Supp. 59 (1964).

Once a prima facie case has been established, it is incumbent upon defendant to bring himself within one of the exemptions set forth in section 4 of the Securities Act: S.E.C. v. Ralston Purina Co., 346 U.S. 119 (1953); Gilligan, Will & Co. v. S.E.C., 267 F. 2d 461 (2 cir., 1959), cert. denied 361 U.S. 896; S.E.C. v. Continental Tobacco Co., 463 F. 2d 137 (5 cir., 1972).

Defendant attempts to satisfy his burden by asserting that the sale of stock to plaintiff was not part of a public offering, but was a private transaction within the meaning of section 4 of the Securities Act: 15 U.S.C. §77(d).

The evidence establishes that from August through October 1968, and from July through September 1969, Jordan sold most of his 4,500 shares not pledged to plaintiff, over the counter to unknown buyers. These sales were exactly the type of public offering the Securities Act intended to prohibit and unless the sale to Warner can be isolated from these sales, then defendant has not established an exemption from the strictures of the act. We are satisfied that plaintiff's purchase of unregistered securities from Jordan is not severable from Jordan's other sales to the general public. As noted in Securities Act Release 4552, 27 Fed. Reg. 11316 (1962):

"A person may not separate parts of a series of related transactions, the sum total of which is really one offering, and claim that a particular part is a non-public transaction."

We believe this to describe the situation here, as (1) all sales involved the same type of securities, all of which had become vested in defendant January 1, 1968; (2) the sales were made in close proximity of time; in fact, the sale to plaintiff on September 1, 1969, completed defendant's distribution of his 3,000 shares for that year; and (3) the sales were made for the same general purpose which amounted to a single plan of distribution, to "hedge" part of the shares and speculate with the remainder. Cf. Securities Act Release 4552, supra, paragraph 2781. As the Securities Act of May 27, 1933 is remedial legislation, it is entitled to broad construction while, on the other hand, its exemptions must be narrowly construed: Hill York Corp. v. American International Franchises, Inc., 448 F. 2d 680 (5 cir., 1971).

From the foregoing, it is evident that defendant has failed to clearly establish that he is exempt from the prohibitions of the act.

Furthermore, even if the transactions involving plaintiff were severable, defendant must still prove plaintiff had knowledge of, or access to, that type of information which a registration statement would disclose: S.E.C. v. Ralston Purina Co., Inc., supra. Warner's only function with Electro-Nite was to promote "Mayday 11." Although he was acquainted with Electro-Nite's president, plaintiff had no dealings with the inside corporate organization, nor was it shown that he had any more than the vaguest information about the financial affairs of the company. Neither his conversations with defendant, nor the "puffed" quarterly report he received as a shareholder were sufficient to furnish plaintiff with the information included in a registration statement. As the court pointed out in U.S. v. Custer Channel Wing Corp., 376 F. 2d 675, 678 (4th cir., 1967):

" 'sophistication' is not a substitute for 'access to the kind of information which registration would disclose.' 346 U.S. at 127 . . . Schedule A of the Securities Act, 15 U.S.C. §77aa (1958), lists 32 categories of information that should be included in a registration statement.[2] This type of information is designed to protect the investor by furnishing him with detailed knowledge of the company and its affairs to make possible an informed investment decision. A purchaser of unregistered stock must be shown to have been in a position to acquire similar information about the issuer.

"Footnote 2. Some of these categories are: the nature and general character of issuer's business; its capital structure; the remuneration to be paid to the issuer's directors and to its officers and other employees, and the nature and extent of their interest in any property acquired; an estimate of the net proceeds to be derived from the securities offered; amounts, itemized in 'reasonable' detail, of expenses incurred in connection with the sale of the security; a detailed balance sheet of the assets and liabilities of the issuer certified by an independent public or certified accountant; a profit and loss statement of the issuer showing earnings and income; the names and addresses and a copy of the opinions of counsel who have passed on the legality of the issue; and a copy of the issuer's articles of incorporation and of its by-laws."

It is apparent that Warner did not know, or have access to, all the information a registration statement would have afforded him, and thus was not a sophisticated buyer in respect to this purchase, notwithstanding his admitted expertise in the securities business generally.

Defendant, nevertheless, relies heavily on plaintiff's signing of the investment letter to establish an ex-

emption, but as the court pointed out in U.S. v. Custer Channel Wing Corp., supra, page 679: "The signing of an investment letter and the imprinting of a legend on the stock certificates are not sufficient to constitute the . . . offering a private one in the absence of proof that the purchasers actually had access to the kind of information that a registration statement would have disclosed."

Plaintiff's almost immediate resale of the stock in violation of his investment letter does not, by itself, estop him from recovering damages. Such would be the case if the sale had been the reason for the breakdown of the private offering exemption: Fuller v. Dilbert, 244 F.Supp. 196 (1965). But that was not the situation. Rather, defendant had long since lost or abandoned any possible exemption when he previously sold shares to unqualified buyers privately and over the counter. Resale by one who has given an investment representation will not defeat his rights nor create an estoppel if he is not in pari delicto with the seller: Katz v. Amos Treat & Co., 411 F. 2d 1046 (1969); Can-Am Petroleum Co. v. Beck, 331 F. 2d 371 (1964). At the time Warner sold the 1,500 shares purchased from Jordan, he had more than 1,500 shares of such stock which he had previously acquired. He believed he was selling those shares. In any event, such sale carried harm to no one, being at market. We thus conclude plaintiff not to have been in pari delicto with defendant.

Finally, we note that even if defendant acted without any intent of violating the Securities Act, if, in fact, he did so, he is subject to the strictures of the act. Even a good faith violation triggers liability: S.E.C. v. Guild Films Co., Inc., 279 F. 2d 485 (2 cir., 1960).

From the foregoing, the court concludes defendants' sale of unregistered securities to plaintiff was

in violation of section 5 of the Securities Act of May 27, 1933 and, no exemption having been proved, their liability under section 12(i) is absolute. Plaintiff is entitled to recover the difference between what he paid for the securities and what he received on their immediate resale, said amount being $19,500, plus interest.

As was stated in the recitation of facts, both the purchasing agreement and the financing agreement were prepared and executed simultaneously, each constituting interdependent parts of a single contract. As we, therefore, find the two writings to be mutually dependent, we feel it unnecessary to discuss the allegations of misrepresentation as to the stock option, for as the purchasing agreement falls, so must the financing agreement.

## ORDER

And now, June 27, 1973, defendants' exceptions to the verdict rendered by the trial judge are dismissed.