**Milton E. DUPUY**

v.

**Clarence O. DUPUY, Jr.**

**Civ. A. No. 73–2370.**

United States District Court,
E. D. Louisiana.

April 26, 1974.

C. Ellis Henican, Jr., and Carl W. Cleveland, Henican, James & Cleveland, New Orleans, La., for plaintiff.

Milton E. Brener, Garon,. Brener & McNeely, New Orleans, La., for defendant.

JACK M. GORDON, District Judge:

The plaintiff instituted this action for recovery of damages sustained due to an alleged violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule X–10b–5 of the Securities Exchange Commission promulgated thereto. 15 U.S.C. § 78j(b),[1] 17 C.F.R. § 240.-10b–5. The defendant has questioned the subject matter jurisdiction of this Court by a motion for summary judgment.

Plaintiff Milton Dupuy (hereinafter referred to as "Milton") and defendant Clarence Dupuy (hereinafter referred to as "Clarence") are brothers who reside in the same apartment complex in New Orleans, Louisiana. In fact, the record reflects that Milton and Clarence's respective apartments adjoin a small common patio. In 1971, the two brothers formed the Lori Corporation for the purpose of building, owning and operating a hotel in the French Quarter of New Orleans, Louisiana. Initially, each brother owned forty-seven (47) percent of the corporation's stock and their mother owned the remaining six (6) percent.

For purposes of preserving the historical character of the French quarter, the City of New Orleans, acting through and with the Vieux Carre Commission, established strict standards and procedures for the granting of permits for expansion, renovation or construction in the French Quarter. The Lori Corporation, after obtaining a long-term lease on suitable French Quarter real estate, received the necessary permits from the City of New Orleans and the Vieux Carre Commission. Therefore, the receipt of these permits resulted in a substantial enhancement of the prospects of the corporation.

Milton alleges that due to health problems he was unable to continue in a managerial position with the Lori Corporation, and that such loss of employment resulted in a deterioration of his financial position. Milton then found it necessary to offer his stock in the Lori Corporation for sale to his brother, Clarence.

The conduct of the ensuing negotiations, which resulted in the consummation of the sale between Milton and Clarence, is the area of contention in the alleged ,Section 10(b) violation. Milton contends that during the course of the negotiations, which were conducted by numerous intrastate telephone calls,

---

1. 15 U.S.C. § 78j reads:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
      *     *     *     *     *
   (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Clarence made untrue representations and failed to disclose material facts in order to induce Milton to sell his Lori Corporation stock at an excessively low price. The misrepresentations and omissions allegedly disparaged the viability of the hotel project, when, in fact, the project was proceeding satisfactorily with substantial financial backing.

Clarence's version of the negotiations differs markedly from Milton's. Clarence denies making any false representations and failing to disclose any relevant information in connection with the stock transaction. Further, Clarence alleges that the negotiations were handled through their mother, who played the role of an intermediary due to the bad feelings which existed between Clarence and Milton. In addition to the residential proximity of the parties themselves, the record reflects that their mother's apartment is located next door to Clarence's apartment.

Thus, the Court has a unique factual setting for this dispute, regardless of which version of the negotiations the Court accepts. Milton maintains that his brother and he communicated only by telephone even though they live next door to each other. On the other hand, Clarence presents a scenario in which the two brothers only communicated through their mother during the course of their negotiations. No matter which view is correct, the case is essentially an intrafamily dispute concerning an interest in what is basically an incorporated joint venture.

Clarence has filed a motion for summary judgment dismissing the complaint at bar for lack of jurisdiction on the grounds that the mails were not employed; that no telephone calls directly were involved, and, alternatively, if any calls constituted part of the negotiations, then such calls were solely intrastate calls; and, that no other instrument of interstate commerce was used directly or indirectly in the transaction. Clarence avers that the transfer of the stock certificates was accomplished in a face to face meeting with Milton, and that the personal check written by Clarence in consideration for the stock shares was handled solely in local banking channels.

For the purpose of discussing this motion, the Court will assume in arguendo that the negotiations were conducted by intrastate telephone calls, as Milton alleges, since such intrastate telephone calls are the only ground asserted in support of the Court's jurisdiction. Thus, the primary legal issue presented to the Court is whether the intrastate use of a telephone, which has interstate capabilities, satisfies the jurisdictional requirement of "the use of any means or instrumentality of interstate commerce," as set forth in Section 10(b) of the Securities Exchange Act of 1934. 15 U.S.C. § 78j(b).

The question of whether intrastate telephone calls alone are sufficient to support Section 10(b) jurisdiction has been encountered previously by the federal courts with differing results. The fundamental reasons for the jurisprudential split springs from the divergent views concerning the proper determination of when an instrument of commerce is an instrument of interstate commerce.

Recognizing that an apparent majority of cases have allowed Section 10(b) jurisdiction based solely on local telephone calls, an examination of the foundation of such line of cases is appropriate. The fountainhead of this line of jurisprudence is Nemitz v. Cunny, 221 F.Supp. 571 (N.D.Ill.1963), in which the court stated:

> It is clear that the use of the telephone constitutes the use of an instrumentality of interstate commerce, unless of course the telephone is merely a part of a private or intra-office hookup. *Id.* at 573.

A reading of the six cases cited in *Nemitz* supporting the quoted proposition reveals that such a per se characterization of any use of the telephone as the use of an instrumentality of interstate commerce is unwarranted. Factually, four of the cases cited as au-

thority in *Nemitz* [Western Union Telegraph Company v. James, 162 U.S. 650, 16 S.Ct. 934, 40 L.Ed. 1105 (1896); Primrose v. Western Union Telegraph Company, 154 U.S. 1, 14 S.Ct. 1098, 38 L.Ed. 883 (1894); Western Union Telegraph Company v. Texas, 105 U.S. 460, 26 L.Ed. 1067 (1882); Matheson v. Armburst, 284 F.2d 670 (9th Cir. 1960), cert. denied, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860 (1961)] involved telephone or telegraph messages sent between different states. For example, Matheson v. Armburst, *supra,* concerned a telephone call made from Oregon to the state of Washington. This Court does not interpret these four cases, either factually or legally, as standing for the proposition that the mere use of a telephone to place local calls constitutes the use of an instrumentality of interstate commerce; rather, they hold only that where calls or messages originate in one state and are received in another state, then the telephone or telegraph so employed is an instrument of interstate commerce.

The fifth such case, Fratt v. Robinson, 203 F.2d 627 (9th Cir. 1953), is not dispositive on the point for which it is cited in *Nemitz,* inasmuch as it dealt with an allegation of the use of the mails in connection with the purchase or sale of securities. Lastly, the court in Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414 (1945), did not consider the jurisdictional proposition for which it was cited in *Nemitz.* *Lenroot* concerned the applicability of the Fair Labor Standards Act to Western Union employees. While holding that the Act did not apply to Western Union, the Supreme Court initially resolved the question of whether telegraph messages were "subjects of commerce" within the contemplation of the Act by concluding that "telegraph lines when extending through different states are instruments of commerce and messages passing over them are a part of commerce itself." 323 U.S. at 502, 65 S.Ct. at 341. In support of this concept,

the Supreme Court cited Western Union Telegraph Company v. James, 162 U.S. 650, 16 S.Ct. 934, 40 L.Ed. 1105 (1896), which involved a telephone call from Alabama to Georgia.

Another decision allowing jurisdiction based on intrastate telephone calls is Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D.Ohio 1964). This case held that the intrastate use of a telephone satisfied the Section 10(b) requirements, 15 U.S.C. § 78j, concerning the use of an instrumentality of interstate commerce. However, the *Lennerth* court relied on an earlier case, Repass v. Rees, 174 F. Supp. 898 (D.Col.1959), which involved an interstate telephone call from Iowa to Colorado. Moreover, jurisdiction in *Lennerth* was actually based on use of the mails.

Bredehoeft v. Cornell, 260 F.Supp. 557 (D.Or.1966) rejected the reasoning of Rosen v. Albern Color Research, Inc., 218 F.Supp. 473 (E.D.Pa.1963), a case which denied jurisdiction founded on an intrastate telephone call, and instead, relied upon language in Hooper v. Mountain States Securities Corp., 282 F.2d 195, 201 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), to the effect that the right of action arises when the "facilities *of* * * * interstate communications are used." However, the court failed to recognize that in *Hooper* the telephone call originated outside of Alabama and was received within Alabama.

The courts in *Nemitz, Lennerth* and *Bredehoeft* made the same blanket characterization that any use of the telephone satisfies the Section 10(b) use of an instrumentality of interstate commerce; however, the courts relied upon cases which did not involve intrastate telephone calls, but denominated the telephone as an instrument of interstate commerce only when the call was interstate. The *Nemitz, Lennerth* and *Bredehoeft* cases paradoxically have formed the foundation for a line of jurisprudence supporting jurisdiction based solely on intrastate telephone calls which

has gained acceptance,[2] albeit acceptance without careful scrutiny of the reasoning and actual holdings of the root cases.

For example, the court in Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), allowed Section 10(b) jurisdiction based on an intrastate telephone call on the ground that the telephone was an integral part of an interstate system, relying on *Nemitz, Lennerth,* and *Bredehoeft.* Significantly, an additional ground of jurisdiction was present in *Myzel;* namely, the interstate transfer of personal checks in connection with the stock transaction. Such ground is not present in this case.

Not only is this Court concerned with the legally questionable per se classification of a telephone as an instrument of interstate commerce, but also with the practical impact of such a holding insofar as it would broaden federal jurisdiction to cover countless purely local security cases such as that now before the bar. Therefore, the Court will discuss the possible consequences of following the *Nemitz* reasoning in connection with the broad regulatory scheme established by the Securities Act of 1933 and the Securities Exchange Act of 1934.

The starting point of the discussion is the definition of a security as stated in 15 U.S.C. § 78c(a)(10) which reads:

The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

While the meaning of most of the devices mentioned is self-evident, the term "investment contracts" has been interpreted liberally to include certain commodities futures contracts, fur-bearing animal breeding contracts, mineral production contracts, lease assignments and certain sales of personalty and realty.[3] The definition of a "person", as stated in the 1934 Act, is similarly sweeping in scope: "The term person means an individual, a corporation, a partnership, an association, a joint stock company, a business trust or an unincorporated organization." 15 U.S.C. § 78c(a)(9). Such comprehensive definitions are necessary if investors are to be afforded protection in the myriad of conceivable investment devices utilized for the generation of capital by all forms of business entities.

In addition to these broad definitions, and in order to accomplish the remedial purposes of the securities laws, the courts consistently have given flexible and expansive interpretation to the requirements of Section 10(b). For example, the "in connection with" language of 10(b) has been the basis for holding that the manipulative or decep-

2. Hill York Group v. American International Franchise, Inc., 448 F.2d 680, 693 n. 18 (5th Cir. 1971); Lawrence v. Securities Exchange Commission, 398 F.2d 276, 279 n. 2 (1st Cir. 1968); Heyman v. Heyman, 356 F.Supp. 958 (S.D.N.Y.1973); Reube v. Pharmacodynamics, Inc., 348 F.Supp. 900 (E.D.Pa.1972) (use of mails also present); Levin v. Marder, 343 F.Supp. 1050 (W.D. Pa.1972) (use of mails also present); Childs v. Ric Group, Inc., 331 F.Supp. 1078, 1082 n. 1 (N.D.Ga.1970); Ingraffia v. Belle Meade Hospital, Inc., 319 F.Supp. 537 (E. D.La.1970).

3. The cases are collected at 15 U.S.C.A. § 77b Note 57–67 and 15 U.S.C.A. § 78c Note 11.

tive communication need not be transmitted by the jurisdictional means, but only that the jurisdictional means be employed in a material part of the transaction. Fratt v. Robinson, 203 F. 2d 627 (9th Cir. 1953). Specifically, in *Fratt,* 10(b) jurisdiction was allowed when the mails were used to transfer stock and make payment after an agreement was reached concerning the terms of the sale in which the fraud was involved. The requirement that the jurisdictional means be employed in a material part of the transaction is susceptible to an elastic interpretation. Such an interpretation may be necessary to retain flexibility in the application of the provision and to prevent avoidance solely on technical grounds. Nonetheless, the Court is aware of the converse: creating federal jurisdiction based on technicalities and artificialities. Further, the Court is concerned with the cumulative effect of these comprehensive definitions and broad interpretations and the consequences that occur when they are employed in conjunction with an overly expansive application of Section 10(b)'s jurisdictional standards to reach cases that only may be connected tangentially to the main body of securities transactions which Congress meant to cover.

The range of possible results in today's complex society may be illustrated by considering several hypothetical situations involving another instrumentality of interstate commerce; namely, federally funded highways. *See,* Alstate Construction Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745 (1953). Consider, for example, whether the requirements of Section 10(b) would be satisfied if an individual drove on a federally funded interstate highway from one area of New Orleans, Louisiana to another area of New Orleans, Louisiana, to give a misleading sales pitch for a purely local real estate investment project, and that such travel was the only ground of jurisdiction asserted. Can

this factual situation logically be distinguished from that present in *Nemitz* in which the court held that the local use of the telephone constituted the use of an instrumentality of interstate commerce for purposes of Section 10(b) jurisdiction?

Suppose this same individual only drove on a street, built solely with state or local funds, which was the only link between two otherwise unconnected portions of a federally-funded interstate highway. Would 10(b) jurisdiction be met in this situation? Applying the "integral part" reasoning of the *Myzel* case, it would seem that the connecting street is an "integral part" of the nation's interstate road system, and therefore, that jurisdiction would be allowable.

These hypothetical situations demonstrate the far reaching effects and unintended results which could flow from the per se characterization of any instrument of commerce as an instrumentality of interstate commerce in all instances simply because it is an instrument of interstate commerce in some circumstances.

However, agreement on the *Nemitz* rationale is not unanimous and other courts which have considered the intrastate telephone call question have reached a contrary result. Of the cases that deny jurisdiction, the first, Rosen v. Albern Color Research, Inc., 218 F. Supp. 473 (E.D.Pa.1963), granted the defendant's motion to dismiss for lack of jurisdiction on the ground that no instrumentality of interstate commerce was employed since the telephone calls were purely local. The court relied on Minneapolis & St. Louis R. R. Co. v. Winters, 242 U.S. 353, 358, 37 S.Ct. 170, 172, 61 L.Ed. 358 (1917), wherein Mr. Justice Holmes reasoned: "Its character as an instrument of commerce depends on its employment at the time, not upon remote probabilities or upon accidental later events." [4] *Accord,* Burke v. Triple

---

4. Minneapolis & St. Louis R. R. Co. v. Winters, 242 U.S. 353, 37 S.Ct. 170, 61 L.Ed.

358 (1917) applies the traditional test which is followed in FELA cases concerning rail-

A. Machine Shop, Inc., 438 F.2d 978 (9th Cir. 1971); Arber v. Essex Wire Corporation, 342 F.Supp. 1162 (N.D.Ohio 1971).

The determination of when a telephone properly may be classified as an instrument of interstate commerce for federal jurisdictional purposes under Section 10(b) or any other federal statute is especially important because of the thorough saturation of our society by a vast and complex communications web. The nerve endings of this communications network reach into virtually every home, office, business establishment and any other regularly frequented location. Coupled with the trait of, availability of the telephone are the characteristics of ease and multiplicity of purposes for which the telephone may be used. To ground federal jurisdiction on a purely local use of the telephone solely because it may be used to make interstate calls would indeed create a boundless base for federal security laws jurisdiction. Practically every individual transaction or activity could be reached on such a basis, and the federal courts would be flooded with litigation involving purely local transactions. Indeed, one could reasonably foresee litigants searching for some artificial use of one of the many instruments of commerce as a vehicle for bypassing the state fraud causes of action in favor of the more liberal remedies afforded and proof required by federal securities laws.

The characteristics of the telephone require not a per se classification procedure, but, rather, a logical test which appropriately will distinguish between local and interstate activity. The most rational method to achieve this end is that formulated in *Rosen, Burke* and *Arber* which would classify the use of the telephone as an interstate or intrastate

activity according to the nature of the calls made at the time in question. Applying that test in the instant case, the Court decides that the local and intrastate use of a telephone is not the use of an instrumentality of interstate commerce for Section 10(b) purposes even though the telephone had the capability of making interstate calls.

In reaching this conclusion, the Court has considered an important question of statutory interpretation; that is, whether by use of the phrase "means or instrumentality of interstate commerce" in Section 10(b) of the 1934 Act, rather than *"in* interstate commerce," as used in many other sections, such as §§ 12 (1), 12(2) and 17(a) of the 1933 Act, Congress intended to include the intrastate use of a telephone as a basis for 10(b) jurisdiction.[5] The courts admittedly have been perplexed and unable to divine the intent of Congress on this issue. Myzel v. Fields, 386 F.2d at 727 n. 2; Ingraffia v. Belle Meade Hospital, Inc., 319 F.Supp. 537 (E.D.La.1970); Rosen v. Albern Color Research, Inc., 218 F.Supp. at 476. As might be expected, contrary and confusing conclusions have been the result. For example, *Rosen* decided that the term "of" in Section 10(b) of the 1934 Act should be interpreted the same as the word "in" used by 17(a) in the Securities Act of 1933, while in *Ingraffia* the court reasoned that the "in" used in 17(a) of the 1933 Act meant "of" as in 10(b) of the 1934 Act. In regard to this issue of congressional intent, the Court recognizes the cases which allow Congress, on the basis of the commerce clause, to regulate purely intrastate activities which substantially affect interstate commerce. Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L.Ed. 122 (1942); Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939); Houston E. &

---

road workers. The cases illustrative of the test applied in *Winters* are collected at 45 U.S.C.A. § 51 Note 275–78.

5. One commentator suggests that use of the preposition was for the purpose of creating

a less awkward phraseology. Latty, The Aggrieved Buyer or Seller or Holder of Shares in a Close Corporation Under the S. E.C. Statutes, 17 Law and Contemporary Problems 505, 516 (1952).

W. Railway Co. v. United States, 234 U. S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1913); Lipinski v. United States, 251 F.2d 53 (10th Cir. 1958). However, an important factor present in the above cases in which the courts upheld congressional regulation of some aspect of intrastate commerce is absent in the case at issue. That factor is the manifestation of positive congressional intent. Here, as the courts which have considered the question admit, the intent of Congress on this jurisdictional point is non-discernible. This Court does not wish to unleash the problems previously discussed by basing 10(b) jurisdiction solely on semantical considerations concerning the use of the word "of" in 10(b), especially since no expression of intent exists, for as stated in Rosen v. Albern Color Research, Inc., 218 F.Supp. at 476: "We are not here concerned with abstract considerations of power but with actual manifestations of Congressional purpose and intent." This Court therefore concludes that it is inappropriate to grant 10(b) jurisdiction based on intrastate use of the telephone solely on the unexplained use of the preposition "of" in the phrase "instrumentality of interstate commerce."

■■ Lastly, the plaintiff contends that the Court should exercise pendent jurisdiction and adjudicate the claim asserted on the basis of Section 91 of Title 12, Louisiana Revised Statutes, relating to fiduciary duties of officers and directors of corporations. However, it is well settled that when the federal claim is dismissed before trial, the Court should not exercise pendent jurisdiction over a state claim. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Shuman v. Sherman, 356 F.Supp. 911 (D.Md.1973).

Accordingly, it is hereby ordered that the motion for summary judgment filed by defendant, Clarence O. Dupuy, Jr., against plaintiff, Milton E. Dupuy, is hereby granted.